## Case No. 9,521.

### The MIANTINOMI.

[3 Wall. Jr. 46; 3 Pittsb. Leg. J. 20; 3 Liv. Law Mag. 598.] [1]

Circuit Court, W. D. Pennsylvania. April Term, 1855.

CONSTITUTIONAL LAW—FEDERAL AND STATE LEGISLATION—WEIGHTS AND MEASURES.

1. The regulation of weights and measures having been given by the constitution to congress, it is doubtful whether the enactments of any state on that subject are of any validity whatever; even though congress have wholly neglected to attend to this regulation.

2. When parties contract for any material by weight, using terms that have come to us from times past, with a definite meaning, such as "tons,"—which have been commonly regarded as meaning 2.240 lbs.,—the mere fact that a state has undertaken to regulate weights and measures, and, in discharge of such an office, has fixed the ton at 2,000 lbs., will not dispense with an obligation to furnish the old measure.

[Appeal from the district court of the United States for the Western district of Pennsylvania.]

The constitution of the United States (article 1, § 8, par. 5) gives to congress the power "to fix the standard of weights," a power which, however, it has never exercised except by an act of May 19th, 1828 [4 Stat. 277], in which it declares that a certain "brass troy pound weight," then in the custody of the director of the mint of the United States, shall be the standard troy pound of the mint. In this state of federal inaction, the legislature of Pennsylvania by an "Act to fix the standards and denominations of measures and weights" in that commonwealth, enacted (section 13) on the 15th April, 1834, that the standard of weight shall be a pound, to be computed upon the troy pound of the mint of the United States, referred to in the act of congress of May 19th, 1828, to wit: "the troy pound of this commonwealth shall be equal to the troy pound of the mint aforesaid, and the avoirdupois pound of this commonwealth shall be greater than the troy pound aforesaid in the proportion of 7,000 to 5,760:" and enacted further (section 17) that "the denominations of weight of this commonwealth, whereof the pound avoirdupois as heretofore provided is the standard unit, shall be, 16 drams, make one ounce; 16 ounces, make one pound: 25 pounds, make one quarter; 4 quarters, make one hundred; 20 hundreds, make one ton." Notwithstanding this law, the ton of coal (the ton weight being the unit by which coal is always bought in Philadelphia), as perhaps of other things, was popularly regarded as being 2,240 pounds. To the great majority of people the existence of the Pennsylvania act was unknown. But towards the close of the year 1853,—coal having been then lately very much, as it continued afterwards,

on the rise in price,—almost all the vendors of coal of Philadelphia, met together in a public way, and having made agreement with one another to this effect, publicly, and in a body, "Resolved, that on and after December 1st, 1853, the weight for a ton of coal shall be 2,000 pounds; and that the price be reduced in proportion to the weight." These proceedings of the coal dealers were matters of great publicity, and known to most persons who burn coal and read the city newspapers. From that time the coal dealers, when furnishing coal in the city, furnished but 2,000 lbs. as a ton.

In this state of facts, one Holt had contracted, previously to these resolutions, to furnish the steamer Miantinomi with several hundred "tons" of coal at the market prices, and turnished that part of his "tons" which he delivered after the resolutions at the rate of 2,000 lbs. He had given no notice to the parties with whom he had contracted, that he was, after the resolutions, furnishing 2,000 lbs. as a ton, and it did not appear that they knew of the resolutions. As a fact, they discovered the change in the kind of "tons" only by observing that the new tons did not burn so long, nor propel the boat so far, as the old ones: in other words, that 2.000 lbs. would not have the effect of 2,240 lbs. In regard to price, while there was nothing to show that compared with the subsequent still rising rates, the libellants had not reduced the price of the short tons in proportion to the reduction of the unit, it was clear that with the still rising prices, the defendants were charged more for one of the short tons, than under the old prices they had been for the large ones. And there was nothing which showed that they knew about rising prices at all. Holt having libelled the steamer for his claim, the owners of the vessel alleged in defence that he "had rendered false weights to the amount of many hundred of pounds," and claimed a deduction to be made for these "tons" of 2,000 lbs.

GRIER, Circuit Justice. [This case was very summarily decided; being submitted without argument by the respondent's counsel. As the subject is of some interest the decision seems to have attracted public attention. In order to avoid the misapprehension so frequently attending off-hand reports of parol opinions, I have concluded to state more particularly the case and the reasons of my decision. The libel in this case is in a cause of contract. Holt, the libelant, claims a balance of account on his contract to supply coal to the steamboat Miantinomi, owned by the New Jersey, Delaware and Pennsylvania Steamboat Company. The respondents, the owners, in their answer, admit the contract with Holt to supply the boat with coal, and "that he pretended to furnish and deliver the amount of coal as stated in his account set forth in this libel, but did not in truth deliver said amounts nor to the value as stated, but

---

[1] [Reported by John William Wallace, Esq., and here reprinted by permission. 3 Liv. Law Mag. 598, contains only a partial report.]

rendered false weights to the amount of several hundred of pounds.

[It appears from the evidence, that after the libelant had continued for some time to deliver coal according to his contract, the agents of defendant's began to observe a deficiency in weight, and that the same nominal amount of tons as then delivered, did not propel the boat so long as at first. That this deficiency was found on weighing to amount to some two or three hundred pounds in every ton. In answer to this charge and by way of justification of his delivery of short measure, the libelant gave in evidence an agreement between himself and some other coal dealers, in December, 1855, to reduce the weight of the ton of coal from 2,240 pounds to 2,000 lbs., and to deliver to their customers thereafter that amount for a ton. How far the laborers, miners and carriers of coal, partook in the benefits of this resolution, does not appear, nor is it important to the decision of this case. It is true, that resolution contemplated a reduction of price in proportion to the reduction of weight. But whether from a mistake in their arithmetic, or for what other reason does not appear, the price was varied in the inverse ratio of the quantity. An inspection of the libelant's account shows that while he delivered 2,240 lbs. to the ton, the charge varied from four dollars up to $4.90 and $5 per ton; but when he commenced to deliver at the short weight, the price varied from five up to $5.80.

[The case, then, is this, a contract is made for the coal at so much, (say the market price) per ton. Anthracite coal being a heavy article, and used in large quantities, the unit by which it is valued and sold is by the ton weight, and not by the measure or by the bushel, as is the custom with dealers in bituminous coal west of the Allegheny mountains. This unit has from time immemorial been the representation, or supposed to be the synonym, for 2,240 lbs. avoirdupois. In the contract before us both parties used the term in that signification. No notice is given to the respondents that thereafter the unit quantity in the sale of coal was to be changed from the ton to the pound, and that the vendor, instead of the ton which he had contracted to deliver, intended thereafter to deliver by the pound, and call 2,000 lbs. a ton, for convenience or calculation; and that while the price for a nominal ton was increasing from twenty to fifty per cent., the quantity was decreased by ten or eleven per cent. The defendants are left to discover this fact by the failure of the 2,000 lbs. to do the duty of 2,400 lbs.] [2]

It is almost superfluous to remark that as it requires the assent of both parties to make a contract, it also requires the same consent to change it. It may be said, that as two multiplied by three will have the same product as three multiplied by two, the result will be the same either way, provided the price be diminished in proportion to the quantity. This is undoubtedly true; but it is not the case before us. The defendants finding the price increasing every few days, continue to pay the apparent market value under the supposition that they are receiving their coal according to the unit of quantity and valuation, when they made the contract. If notice had been given them that eleven per cent. was to be added secretly to the price by this contrivance of diminishing the quantity, they might not have assented to it. And until they can be shown to have assented to it, they cannot be made its victim.

If the grocers in a particular street finding that it would add much to their profit in times of scarcity and high prices, to deliver flour and other provisions at the pound troy instead of the pound avoirdupois, as heretofore, and should conspire together to deliver thereafter but twelve ounces to the pound instead of sixteen, such conduct would receive no countenance from the public thus imposed upon, and in courts of justice would be treated as a fraud, and receive that appellation without seeking for a milder synonym.

Coal is a necessary of life in this climate, and unfortunately for the consumers, the demand has increased to such an extent as to put it in the power of those who supply it to extort their own price. When its price was moderate, and the profits of the vendor merely remunerative, there were no schemes to reduce the quantity by changing the meaning of words to suit the rapacity of speculators. This scheme of reducing the quantity by ten per cent. was not concocted till after prices had increased twenty-five per cent. and were proceeding up to fifty. When it was discovered that competition could not check speculation on a necessary of life, the public were made the victims of this agreement, contrivance, conspiracy, or whatsoever it may be called.

My attention has been turned to an act of the Pennsylvania assembly passed in April, 1834, on the subject of "weights and measures." [By this act it is stated that the "pound troy as kept at the mint of the United States should be the standard of weight—that the pound avoirdupois should exceed the pound troy in weight in the proportion of 7,000 to 5,760—that 25 pounds should make a quarter and 2,000 pounds a ton."] [2] For the purpose of the present case it may not be necessary to decide upon the power of any state legislature to make such an enactment. It was probably intended for the convenience of the officers on their public works. As approximating decimal divisions it is much more convenient for calculation when the pound is made the unit on which to compute price or value. In very many cases the pound and its decimal multiples have been adopted almost entirely instead of the old quarters, hundred weights and tons; just as

25 feet has been adopted by engineers as the cubic yard instead of 27. But in all those cases a change of language is made to suit this convenient change of multiple. Thus the engineer would state on a contract for excavation the price at so much "per cubic yard of 25 feet." So the terms "per 100 lbs.," or "hundred neat," are substituted for "cwt.," which represents 112 lbs. And when the ton is used to represent, for convenience of calculation, 2,000 lbs., the contract should and usually does so state it as "per ton of 2,000 lbs.," or "per ton neat." But as coal and other cheap and heavy articles have never been sold by the pound as a unit for calculating its price, but by the ton, convenience of calculation has never required, nor has custom sanctioned any reform (so called) or change in the amount so represented by this unit. Accordingly, notwithstanding, that this act of the legislature was passed more than twenty years ago, it has never been adopted in practice in the sale of coal and other heavy articles whose unit of calculation is usually by the ton and not by the pound.

The congress of the United States having the power to regulate commerce between the several states, it was of great importance that the value of money and the standard of weights and measures should be uniform. Accordingly their regulation is intrusted to congress. Every change or innovation by the several states would tend only to increase confusion and difficulty. This duty intrusted to congress, seems apparently to have been much neglected. I find no legislation on the subject by congress, except in the act of May 19th, 1828, c. 67, where it is enacted that "the brass troy pound weight, procured by the minister of the United States at London, in the year 1827, for the use of the mint, and now in the custody of the director thereof, shall be the standard troy pound of the mint of the United States." As the English standard of weights and measures had been adopted by long custom in every state, it was, perhaps, unnecessary for congress to interfere further than it has done. For as the standard of the London tower weights, and the English terms or denominations used to represent their fractions and multiples, were universally adopted in the United States, and of course uniform, nothing was required of congress, unless it entirely changed its standard and introduced decimal fractions and multiples for greater facility of calculation, as it has done in our coin. Whether this uniformity of weights and measures has been established by custom or congressional legislation, it is evident that any interference of state legislation to change either the standard of weights or the meaning of the terms used to represent its multiples or fractions, is not only useless but injurious. Accordingly, the provisions of this act of assembly have remained a dead letter, and it is practically obsolete so far as concerns the standard ton. It compels no one,

nor could it do so, to adopt its use of language. Men may contract either with or without its sanction to make the pound their unit, and to sell at so much per 100 lbs.—or so much for 2,000 lbs., and they may call it, or any other multiple of a pound, a ton, if the parties to the contract agree to do so. But this act, if it have any efficacy whatever, (which, as I have intimated, is doubtful,) cannot be invoked to change the terms of a contract contrary to the consent of one of the parties, or to authorize vendors who buy coal at one standard of weight to sell it at another, and thus extort from purchasers an increased price for a diminished quantity.

A deduction must be made as claimed by the defendants on their theory that 2,240 lbs., and not 2,000 lbs., are a ton.